LEIGH M. CLARK, Retired Circuit Judge.
A jury found this appellant guilty on a trial on an indictment that charged in pertinent part that “Charles B. Simmons ... did, intentionally cause the death of another person, Jessica Grant, by hitting her with his hand or an object otherwise unknown to the Grand Jury, in violation of Section 13A-6-2 of the Code of Alabama.” After the court adjudged the defendant guilty, a sentencing hearing was conducted subsequent to the State’s having given due notice to defendant and his counsel that it would proceed against defendant pursuant to the Habitual Felony Offender Act. The court sentenced the defendant to imprisonment for life, it being shown without dispute that defendant had been previously convicted of two felonies.
We now proceed to consider the only two issues presented in brief of counsel for appellant, which are:
“1. DID THE TRIAL COURT ERR IN DENYING THE DEFENDANT’S MOTIONS FOR JUDGMENT OF ACQUITTAL BY APPLYING THE SCINTILLA RULE?
“2. WAS THERE SUBSTANTIAL EVIDENCE OF EACH ELEMENT OF THE OFFENSE OF MURDER FOR THE COURT TO CONSIDER IN RULING UPON THE DEFENDANT’S MOTIONS TO EXCLUDE THE STATE’S EVIDENCE?”
It is to be noted that each of the two issues is substantially the same as the other, i.e., appellant contends by each of the issues that the evidence was not sufficient to present a jury question as to defendant’s guilt because in a criminal case a submission to a jury of the question of defendant’s guilt is dependent upon the existence of substantial evidence of his guilt, in contrast with the principle of law applied in civil cases that a plaintiff is entitled to have his case submitted to a jury if there is a scintilla of evidence in his favor as to the gravamen of his complaint.
According to the undisputed evidence, on the trial of this case, Jessica Grant, the alleged victim, was born December 21, 1981, of her unwed mother, Mary Ann Grant, and died at her home on the night of February 4-5, 1982. Mary Ann Grant was the first witness for the State on the trial of the case. She testified at length as to the circumstances of the death of her daughter. In the early part of her testimony, she stated that C.B. Simmons, the defendant, killed her baby.
Dr. Thomas Gilchrist, a forensic pathologist with the Alabama State Department of Forensic Sciences, was the second witness for the State. He testified that on February 5, 1982, he performed a post-mortem examination of the body of Jessica Grant *464 and found that it was “thin and emaciated, small” and that “the actual cause of death” was “blunt injury to the head.” He further testified:
“A. There were several areas that had deep bruises on the head indicating a number of blunt injuries to the head.
“Q. Some worse than others?
“A. Yes.
“Q. Which was the worst one, please, sir?
“A. The bruises were on the right front at the very top of the left side in back of the head. The injury to the underlying brain was only below the one on the very top of the head.
“Q. And how severe was that injury to the brain?
“A. It’s a bruising of the brain which indicates a severe force applied to the head.
“Q. Would it have caused swelling of any nature?
“A. No. Injuries of this sort to the brain, actually bruising of the brain, always invariably results in swelling of the brain.
[[Image here]]
“A. Well, the time I saw the child, rigor mortis had not developed but libor [sic] mortis had. However, the development of rigor mortis in a severely emaciated infant is not as dependable as it is in adults. The body was cool but it had been cooler. My evidence would indicate that the body had been dead more than a day or two or three but then my evidence is not nearly as good as people at the scene. Because when I saw the body it had been placed in a cooler the evening before and locked in and secured. So body warmth and things like that were artificially changed.
[[Image here]]
“A. My opinion was that death occurred within two to three days. I didn’t say one or a half day. That would fit in that time frame; therefore, it would be consistent.”
Among the items of evidence relied upon in the brief of counsel for appellant was a copy of a statement given by Mary Grant to police officers, which was admitted into evidence as Defendant’s Exhibit 4. We now quote from appellant’s brief that part of her statement relied upon by appellant’s attorney:
“Q. Mary, what do you know about the physical abuse Jessica received, prior to the time of her death?
“A. Well, Mr. C.B. Simmons threw the baby against the floor. Well C.B. had been trying to go with me. He came to my house on Wednesday night which would be the 3 of February. He brought some gin with him. I think it was half a pint. He had been drinking before he got there. He set around and drank for a while, I had two drinks and C.B. had three drinks. C.B. got drunk and he started trying to have sex with me and this went on pretty well all night. He started tussling with me, he was cussing and hollering at me and he woke Patricia up. Patricia was hollering at C.B. and telling him to leave me alone. Jessie was crying too. Casandra was sitting up in the bed and she was crying too. He grabbed Jessica up by her feet and slung her head against the floor, then he picked Jessica up with both hands around her ribs and shook her. Then he throwed Jessica back on the bed. I went to him and told him what did he do that for and he shoved me down. I told him that I was going to call the police and he told me that he would kill me. Patricia tried to go out the door and he told her if she did that he would kill her. I started fighting him again and he went out the door. Oh, Patricia got the broom after him. Well that is about it.
“Q. Mary, what time did C.B. Simmons come to your house on the Wednesday you referred to in the other question?
“A. It was about 6:00 pm.
“Q. Mary, what time was it when he threw Jessica on the floor?
“A. It was in the early morning hours on Thursday about daylight.
*465 “Q. Mary, what happened to Jessica after C.B. Simmons had thrown her on the bed?
“A. She cried about half of a minute then she stopped.
“Q. Mary, did Jessica ever cry any more after the half minute?
“A. No.
“Q. Was Jessica still alive when you put her down at 6:30 a.m.?
“A. Yes, she was.
“Q. Mary, who found Jessica dead on Thursday afternoon?
“A. My mother found that Jessica was dead in the bed about 2:30 pm. My mother had come to my house about 12 noon.
“Q. Have you told anyone else what you just told us?
“A. No.
“Q. Mary, why have you not told us this earlier?
“A. Because I was afraid that C.B. would kill me.
“Q. Mary, why did you call Cummings Funeral Home after Jessica was found dead and not the police?
“A. I did not know I was supposed to call the police.
“Q. Mary, have you told me the complete truth of your own free will?
“A. Yes, Sir.
“Q. Why have you told me this?
“A. Because I could not sleep and I know I was not telling ya’ll the truth.
“Q. Mary, is there anything else that you would like to add to this statement?
“A. No.”
There are further statements in brief of counsel for appellant that disclose that there were discrepancies in the testimony of the mother of the alleged victim, which included the following extracts from brief of counsel for appellant:
“On page R-44, 45 she testified that after the incident that Patricia did not go back to bed and she further acknowledged testifying previously that Patricia woke up a little while but finally went back to bed. She said that her prior testimony was a lie. On R-46 Mrs. Grant testified that her mother found the baby dead at 12:00 noon, and denied giving a statement to the police that her mother found the baby dead at 2:30 P.M. “Mrs. Grant testified that Abe and the Grandmother argued on the Tuesday pri- or to the baby’s death, but denied that anyone tried at that time to harm the baby. She acknowledged that her mother would stick all three babies with pins. The Defendant never touched the baby until this incident, and he never mistreated any of the children. R-51, 52, 53, 55, and 56.
“On pages R-65 and 66 Mrs. Grant testified that she had a little baby jar full of gin to drink on that night and denied testifying previously that she had two drinks. In her statement to the police, she stated that she had two drinks. Defendant’s Exhibit 4. She acknowledged that she did not tell the truth about the amount that she drank in her previous testimony. On pages R-66, and 67 Mrs. Grant testified that C.B. had been there some 2.5 hours when she went to the bathroom.”
At the conclusion of the presentation of testimony of the State, the following occurred out of the presence of the jury:
“MR. DAVIS [Attorney for defendant]: Your Honor, at this time the Defendant would move to exclude the evidence and for a motion for a directed verdict of acquittal. On the grounds, we feel the State has not established a prima facie case. I don’t know if they established venue as well. On those grounds we feel they have not made a prima facie case. We would move to exclude the evidence and also for a directed verdict of acquittal.
“THE COURT: All right. The Court is constrained to find there is a scintilla on each element of the offense charged and consequently obliged to deny the defense motion for a directed verdict of acquittal and to exclude the evidence.
“MR. DAVIS: All right, sir.
*466 “THE COURT: Okay. Let’s take a break folks.
“(Whereupon, at 3:45 p.m. the Court recessed and at 4:05 p.m. the trial resumed.)”
The defendant then promptly commenced the presentation of his evidence, first by the witness Patricia Grant, the ten-year-old daughter of Mary Grant, who testified in pertinent part on direct examination as follows:
“Q. You remember Jessica, don’t you? Who was Jessica?
“A. A baby.
“Q. Do you know how old she was?
“A. (Indicating no.)
“Q. She was about six weeks old. She was real tiny, right?
“A. Uh-huh.
“Q. She used to cry a lot too, didn’t she? “A. Yeah.
“Q. Now, your grandmother didn’t like Jessica too well, did she?
“A. Uh-uh.
“Q. Your grandmother and her boy friend too, didn’t they?
“A. Uh-huh.
“Q. What was her boy friend’s name? “A. Abe.
[[Image here]]
“Q. Abe didn’t like the baby either, did he?
“A. Yeah.
“Q. He liked the baby?
“A. Uh-huh.
“Q. You told Ms. Hall he didn’t like the baby, do you remember telling Ms. Hall that?
“A. Yeah.
“Q. So Abe really didn’t like the baby, did He?
“A. Uh-uh.
“Q. And he and your grandmother used to stick pins in the baby, didn’t they?
“A. Yeah.
“Q. Why did they do that? They were being mean to the baby?
“A. Yes.
“Q. You didn’t like it when they were being mean to the baby, did you?
“A. No.
“Q. Did anybody cut her, cut the baby? Did you ever see anybody cut the baby with a knife?
“A. (Indicating no.)
“Q. Or just pins?
“A. Knife.
“Q. Who did you see with a knife?
“A. C.B.
“Q. You saw C.B. with a knife? When did you see C.B. with a knife?
“A. Wednesday night.
“Q. What time? Do you remember?
“A. Uh-uh.
“Q. Let me ask you about your grandmother some more. Did she ever tell you about not telling things that happened in your house?
“A. Uh-uh.
“Q. Did she say if you told what happened she wouldn’t buy anything for you? Do you remember telling me about that?
“A. Yeah.
[[Image here]]
“Q. Now, do you remember the first time you talked to Ms. Hall after Jessica died?
“A. Yeah.
“Q. What was the first time you talked to Ms. Hall? Was it that Friday?
“A. Yeah.
“Q. Did she come and pick you up from school? That was the Friday after Jessica died, right?
“A. Yeah.
“Q. You talked to her a long time, didn’t you?
“A. Yeah.
[[Image here]]
*467 “Q. You talked to them [police officers] again, well, on that Friday you told them Wilk had hurt the baby, didn’t you?
“A. Yeah.
“Q. Okay. And then when you talked to them again on February, about February 11, which was about a week after Jessica died, you told them that your grandmother had been sticking pins in the baby?
“A. Yeah.
“Q. And you told them how they were at the house drunk there too, weren’t they?
“A. Yeah.
“Q. Who all was at the house drunk, if you remember? Wasn’t your mama there?
“A. And C.B.
“Q. C.B.? Did you tell Ms. Hall that C.B. was there?
“A. Yeah.
“Q. On February the 11th you didn’t tell Ms. Hall C.B. was there. I’m not talking about the third time you talked to Ms. Hall. I’m talking about the second time on February 11th, you didn’t tell her C.B. was there, did you?
“A. (Indicating no.)
“Q. You told her your grandmother was there? Do you remember now?
“A. Yeah.
“Q. You told her Abe was there?
“A. Yeah.
“Q. You told her Wilk was there?
“A. Yeah.
“Q. You said you were there and Casandra was there and Wilk had a knife after the baby’s neck trying to cut the baby. Do you remember telling Ms. Hall that?
“A. Yeah.
“Q. Didn’t you also tell that the baby got sick a lot and used to throw up? Do you remember telling Ms. Hall that? You don’t remember telling her the baby would get sick and throw up sometimes?
“A. Uh-uh.
“Q. Okay. Now, you told Ms. Hall your mother whipped you sometimes, didn’t you?
“A. Yeah.
“Q. When does your mother whip you?
“A. When I do something wrong.
[[Image here]]
“Q. You didn’t? Okay. Tell us what happened? Tell us what you saw C.B. do. Is it kind of hard to say? You don’t want to say what C.B. did?
“A. (Indicating no.)
“Q. Did you see him do anything on Wednesday night?
“A. Yeah.
“Q. Okay. Do you remember what time it was?
“A. Twelve.
“Q. Twelve o’clock.
“A. (Indicating yes.)
“Q. Did you go back to bed after that happened, after they had finished doing whatever happened?
“A. Yeah.
“Q. Okay. Do you remember what happened?
“A. When he had put the knife around her neck and twisted her leg, twisted her arm and throwed her on the bed.
“Q. Was this the bed in your room?
“A. (Indicating no.)
“Q. In the front room? You saw him put the knife to her neck?
“A. Yeah.
“Q. You remember telling Ms. Hall that you saw Wilk put the knife to her neck? “A. Yeah.
“Q. Then you didn’t say anything about C.B. did you?
“A. No.
“Q. Did you tell Ms. Hall the truth?
“A. (Indicating no.)
“Q. You didn’t tell Ms. Hall the truth? Why not? You didn’t tell Ms. Hall the truth?
*468 “A. (Indicating no.)
“Q. Now, you said you saw C.B. sling her back on the bed. How did he pick her up? He picked her up, then what did he do?
“A. He put her back on the bed.
“Q. Did he put her back on the bed? “A. Yeah.
“Q. Did he put her down easy?
“A. (Indicating no.) No.
“Q. He didn’t?
“A. (Indicating no.)
“Q. How did he put her down? Did he throw her down hard?
“A. Yeah.
“Q. Did it hurt?
“A. (Indicating no.)
“Q. Did she start crying?
“A. Uh-uh.
“Q. She didn’t cry?
“A. (Indicating no.)
“Q. Okay. Let’s go back to that. Did you say before C.B. came over there? Do you remember when your grandmother was over there and Wilk and they were arguing and they were on the floor drunk? Do you remember that?
“A. Yeah.
“Q. What all happened then? They started fighting that day too, didn’t they?
“A. Yeah. In the front room.
“Q. That’s where the baby sleeps, wasn’t it?
“A. Yeah.
“Q. And you told Ms. Hall that they picked up Jessica and threw her on the floor too, didn’t you?
“A. Yeah.
“Q. And your grandmother and Wilk were saying mean things to the baby, weren’t they?
“A. Yeah.
“Q. Do you remember what they said? Do you want to tell us? Bad things? Did they say real bad things?
“A. (Indicating yes.)
“Q. Okay. I’m going to ask you a few more questions, okay? I'm showing you what’s marked defendant’s Exhibit number seven. All right. Is that your signature on there?
“A. Yeah.
[[Image here]]
“Q. Okay. So this is a statement that you made to Ms. Hall on March the 8th?
“A. Yeah.
“Q. Okay. And your mama was not at home when you made this statement was she?
“A. (Indicating no.)
“Q. You had talked to your mother about this, hadn’t you?
“A. (Indicating no.)
[[Image here]]
“Q. In this statement you had talked to Ms. Hall and Officer Brock. Didn’t you tell them that C.C. [sic] came to your house on Wednesday afternoon to see your grandmother. Your grandmother was there on Wednesday afternoon?
“A. Yeah.
“Q. C.C. [sic] came by to see her?
“A. Yeah.
“Q. They started arguing?
“A. Yeah.
“Q. What were they arguing about?
“A. I don’t know.
[[Image here]]
“Q. Did C.B. ever say anything bad about Jessica? Did you ever hear him say any bad words about Jessica? He never said anything bad, did he?
“A. No.
“Q. He never said anything bad to you, did he?
“A. Yeah.
“Q. He did? What did he say to you? “A. He said he was going to kill me. “Q. Okay. What did he say to you? You can’t remember?
“A. (Indicating yes.)
*469 “Q. Okay. Let’s try it again. What did C.B. say to you that time?
“A. He said if I tell anybody he was going to kill me.
[[Image here]]
“Q. Your mama told you C.B. was a bad man?
“A. No.
“Q. You think he is a bad man?
“A. Yeah.
“Q. You think C.B. is a bad man? Did C.B. ever treat you bad when he was over there?
“A. (Indicating yes.)
“Q. He did? What did he do? You telling me the truth? What did C.B. do to you? Tell me what C.B. did to you. Come on. You said C.B. did something bad to you. What did he do? Did he ever curse you or say bad things to you? You don’t want to tell me?
“A. (Indicating no.)
[[Image here]]
“Q. Let me ask you this now: you said when Wilk, when you told Ms. Hall that Wilk and your grandmother and Abe were at the house, this happened on that Tuesday before C.B. came over, right? That was the day before, right?
“A. Yeah.
“Q. Okay. And this was when they were fighting and carrying on that Tuesday before, right?
“A. Yeah.”
On cross-examination by the State, Patricia Grant testified in part as follows:
“Q. Do you see in Court today the man who hurt Jessica Wednesday night before she died, the man you said put a knife on her throat, twisted her leg and threw her down? Do you see him in Court today?
“A. Yes.
“Q. Can you please point him out? Okay, what does he have on?
“A. Black, white.
“Q. What color shirt?
“A. White.
“Q. What color tie?
“A. Black.
“MS. ENFINGER: Let the Record reflect she indicated the Defendant.
“THE COURT: So noted.
“Q. (By Ms. Enfinger) Have you ever seen him before that Wednesday night, Trish? Have you ever seen C.B. hurt Jessica before that?
“A. No.
“Q. Who is Wilk, Patricia, is there really a Wilk?
“A. No.
“Q. Is Wilk a made-up name?
“A. Yeah.
“Q. Okay, Trish, you remember the Wednesday night before Jessica died on Thursday before you found out. Can you just look at these ladies and gentlemen again and just tell them exactly what you saw C.B. do to Jessica? Can you do that one more time? What exactly did you see C.B. do to Jessica?
“A. Put a knife around her neck.
“Q. And did you see him do something else to her?
“A. Twisted her leg. Twisted her arm and throwed her back on the bed.”
The next and final witness for the defendant was the defendant himself. He testified that he had known Mary Grant since 1980, that Mary Grant had come down to his place, that he and she “started making friends with each other” and that they were on “intimate terms,” meaning that he had “sexual relationship with her.” His testimony continued in pertinent part as follows:
“Q. How many times did you visit Mary Grant between the time the child was born and February 1982? Can you estimate?
“A. Oh, I would go see her once or twice a week, sometimes three times.
“Q. Did you go to Mary Grant’s house on Wednesday, February 3rd, 1982?
“A. Didn’t go there in the daytime. I didn’t go until the night.
*470 “Q. What time of night did you go to her house?
“A. Approximately 11:45 because I was waiting for my brother to call.
[[Image here]]
“Q. Okay. How did you get in when you went to her house that night?
“A. Just knocked on the door.
“Q. What time did you say it was anyhow?
“A. About 11:45, I guess.
“Q. When you knocked on the door, who let you in?
“A. Mary.
“Q. Did you take anything with you when you went to her house?
[[Image here]]
“Q. You say you got there at 11:45. What did ya’ll do once you got there?
“A. We sat there and talked awhile, then we had a relationship and I got ready to leave.
“Q. Did you and Mary have sex that night?
“A. Sure did.
[[Image here]]
“Q. Did you ever hit the baby?
“A. Never. I wouldn’t dare to hit no baby. Wouldn’t like nobody hitting a baby around me.
“Q. Now, you testified, I’m sorry, Mary testified that you picked the baby up off the bed and threw it to the floor, or so she thought. Is that true?
“A. No. It’s not true.
“Q. Did you pick the baby up on the Wednesday night that this happened?
“A. On the Wednesday night, I ain’t seen no baby to pick up. Just like she was sitting up there with no baby. That’s all she was. She was sitting there by herself alone. She said she was worried or something about her money and her gas was cut off.
“Q. Okay. When did you learn that something had happened to this baby?
“A. I didn’t learn it until that Friday evening when I went—
“Q. That Friday evening what?
“A. I went by there Friday.
“Q. You went by Mary’s house on that Friday? What happened on that Friday?
“A. When I drove up I got out and went inside and she told me, said you have heard about my baby passed, didn’t you? I said no. I said what happened to it? She said the baby died naturally. She said the baby had been sick.
[[Image here]]
“Q. Did you at any time touch Jessica Grant?
“A. Never have touched her.
“Q. You heard Mary testify that you threatened to kill her if she told what happened Wednesday night. Is that true?
“A. That’s false.
“Q. Did anything happen that Wednesday night involving Jessica Grant?
“A. Nothing happened at that house all the time I was there. No day I was there nothing happened, no night.
“Q. Mr. Simmons, tell me, how did Mary treat Jessica Grant?
“A. She was pretty cruel to all of them.
“Q. Explain that, please.
“A. Well, one thing about her, she would cuss them. The baby, the big girl, she would get in the room and try to beat her and I told her she ought not to do that. She said she was hers. The baby, I used to tell her she shouldn’t slap on the baby like that, it was too little. She said it was hers. I didn’t have anything to say about it.
“Q. Did she act like she loved the baby?
“A. She said she didn’t even want the baby. She had made statements that she was going to put him in the garbage can or something.”
We have endeavored hereinabove to set forth some of the evidence tending to show the guilt of the defendant and some of the evidence tending to show that he was not guilty. It is not within our province to determine whether evidence tending to show the defendant’s guilt was stronger than was the evidence tending to show that he was not guilty, as neither this Court nor the trial court has been called upon to pass *471 upon that question. We are convinced that the evidence of defendant’s guilt was substantial, that it was more than a mere scintilla and, therefore, the judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article; his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur, except TAYLOR, J., who recuses himself.